A04A0410. ANDERSON v. THE STATE.
(592 SE2d 910)

ELDRIDGE, Judge.
Following a bench trial in the Superior Court of Floyd County, Clifford A. Anderson was found guilty of possession of cocaine. He appeals and, without otherwise challenging the sufficiency of the evidence against him, claims error in the trial court's denial of his motion to suppress based upon an allegedly illegal stop of his vehicle and an invalid consent to search. Upon review of the circumstances surrounding both grounds for suppression, we affirm Anderson's conviction.

> On appeal from a motion to suppress, the evidence is viewed in a light most favorable to upholding the trial court's judgment. The credibility of witnesses and the weight accorded their testimony rest with the trier of fact. Thus, the trial

---

court's findings on disputed facts and credibility must be accepted unless clearly erroneous.[1]

So viewed, the record shows that Anderson's driver's license was suspended following a May 2001 conviction for violation of the Georgia Controlled Substances Act. Floyd County Sheriff's Deputy R. Clemones testified at the suppression hearing that he was very familiar with Anderson. In the recent past, Clemones had arrested Anderson for drugs, as well as participated in the execution of a number of narcotics-based search warrants wherein Anderson was present at the locale to be searched. Deputy Clemones had personal knowledge that Anderson's driver's license had been suspended. Clemones also had personal knowledge that Anderson continued to drive a car despite his suspended license. At one point in 2001, Clemones saw Anderson driving with his license suspended; when Anderson saw the deputy, he abandoned his vehicle and fled on foot. Further investigation of Anderson in the summer of 2002 revealed that Anderson's driver's license was still suspended, as it had been for over a year.

Approximately four months later, on November 22, 2002, Deputy Clemones again saw Anderson driving. He performed a traffic stop in order to determine if Anderson had a valid driver's license. Anderson pulled over into a parking space on Broad Street in front of the First Union Bank in Rome; the deputy pulled his vehicle in behind Anderson's car, sufficiently out of traffic to exit the vehicle. As he approached the car, Clemones testified that he "observed Mr. Anderson leaning forward. It appeared to be he had his hands down below the seat, at which point he raised back up."

Deputy Clemones asked Anderson for his license, which was produced. Anderson's driver's license had been reinstated two weeks earlier on November 8, 2002. Clemones told Anderson that he knew he did not have a license prior to this point; Anderson concurred and stated that he "just got them back in the past couple of weeks." Clemones handed Anderson's license back to him and asked for consent to search the vehicle. Anderson told the officer that the car belonged to his mother, but "he said no problem. He stepped out of the car and [Clemones] started the search." The deputy testified that Anderson was "very cooperative"; that he asked for consent to search "[j]ust one time and [Anderson] hopped right out." A set of digital scales was found under the driver's seat; the scales contained trace amounts of cocaine.

Anderson also testified at the suppression hearing. He testified

---

[1] (Punctuation and footnotes omitted.) *Sanders v. State*, 247 Ga. App. 170 (543 SE2d 452) (2000).

that Deputy Clemones never told him why he was stopped; he testified that he refused consent to search the car. Anderson stated that, in response to the deputy's requests to search, he was "just telling [Clemones] no, it was my mom's car."

The trial court denied the motion to suppress, finding that Clemones had "probable cause" to stop the vehicle by virtue of his past experience with Anderson. In so holding, the trial court made the observation that this Court incorrectly applies *Terry v. Ohio*'s[2] "reasonable articulable suspicion" evaluative standard in order to determine the propriety of a traffic stop: "Now the Court of Appeals talks about articulable suspicion. That is wrong." The trial court stated that, with all due respect to this Court, the deputy's pull-over of Anderson was not a *"Terry* stop"; that a *Terry* stop applies only,

> to frisks or pat-down for weapons when an officer has an articulable suspicion that a person might be armed during a police encounter. You can't stop a vehicle on a *Terry* stop. . . . You may not stop a person's automobile without probable cause.

Additionally, in the face of conflicting testimony, the trial court made the credibility determination that Anderson did in fact consent freely and voluntarily to Deputy Clemones' request to search. *Held*:

1. In his first claim of error, Anderson contends Deputy Clemones did not have sufficient reasonable suspicion of criminal activity to justify the stop of Anderson's vehicle. He argues that the four months between the stop and the information that Anderson's license was suspended rendered the suspension information "too remote" to create a reasonable suspicion of criminal conduct. We disagree.

Anderson's license was suspended by operation of law pursuant to OCGA § 40-5-75 (a) which provides that the driver's license of any person convicted of possession of any controlled substance proscribed by OCGA § 16-13-30 will be suspended. Under the terms of OCGA § 40-5-75 (a) (1)-(3), suspension "shall be for not less than 180 days" for a first conviction, not less than three years upon a second conviction, and not less than five years upon a third conviction. Further, not only must a suspended licensee apply for reinstatement with the Department of Motor Vehicle Safety, he or she must also show proof of the completion of a DUI Alcohol or Drug Use Risk Reduction Program approved by the Department of Human Resources before a sus-

---

[2] *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

pended license will be reinstated; additionally, a restoration fee of at least $200 must be paid.[3]

In this case, Clemones knew that Anderson drove on a suspended license. Because in some instances the time periods for suspension of a license can extend for at least five years and a suspended license is not reinstated automatically but must be obtained through specific actions of a suspended licensee, we do not find as "too remote" the four months between Clemones' information that Anderson's license was suspended and the instant stop. It does not appear unreasonable for an officer to determine whether the conditions for the reinstatement of a driver's license have in fact been met by a driver known to drive with a suspended license. Contrary to Anderson's argument, Deputy Clemones was not required to *know* that Anderson's license was in suspension; what was required was a reasonable articulable suspicion that Anderson might be driving on a suspended license. That reasonable suspicion was present in this case, and the fact that Anderson's license had been reinstated two weeks earlier does not negate the validity of that suspicion.

> [Deputy Clemones] stopped [Anderson], in part, based on his prior experience with him and his knowledge that [Anderson's] license had been suspended. It would not have been unreasonable for [Clemones] to suspect that [Anderson's] license suspension remained in effect and that [Anderson] was violating the law by driving.[4]

Under this same claim of error, we acknowledge the expressed concerns of the court below regarding the proper analysis for traffic stops. Traffic stop analysis is a legal issue that the Superior Court of Floyd County must employ frequently, and thus, it is a topic that is neither hypothetical, abstract, nor simply academic in that legal community. For this reason, we will afford the superior court's concerns our judicial consideration.

This Court maintains a steady vigilance against the hubris of a potential error gone unexamined. Review is required when our attention is directed to an alleged mistake as pervasive as the use of an incorrect standard for the evaluation of traffic stops would certainly be. Accordingly, we must ask if our legions of cases finding the stop of an automobile proper upon articulation of a "reasonable suspicion" as per *Terry v. Ohio* are simply wrong, as maintained by the court

---

[3] OCGA § 40-5-75 (a) (1)-(3).

[4] *Johnson v. State*, 246 Ga. App. 197, 198-199 (1) (540 SE2d 212) (2000) (eight months between officer's notice of defendant's suspended license and the stop of defendant's vehicle based thereon).

below, and whether, as urged below, a "probable cause" standard has indeed been the correct evaluative course all along. To *Terry* we go for the answer only to find that, as accurately described by the trial court, *Terry* was directed toward a stop made in order to perform a protective frisk. But, upon a closer reading, we discover that the *Terry* court utilized the opportunity presented by that case to explore the boundaries of the Fourth Amendment's proscriptions against unreasonable seizures on a standard less than probable cause because of the abbreviated, noncustodial nature of a stop made to perform a frisk-type search. To that end,

> Prior to *Terry v. Ohio, supra*, any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.[5]

The *"Terry* Doctrine" has been expanded to other situations involving limited, noncustodial seizures. And following the *Terry* line of cases, we ineluctably are led to, inter alia, *United States v. Brignoni-Ponce*,[6] *Berkemer v. McCarty*,[7] and *United States v. Sharpe*,[8] wherein the Supreme Court analogized an automobile traffic stop to a *"Terry* stop" and authorized the evaluation of the propriety of such traffic stop not on a "probable cause" standard, but on an officer's "articulable and reasonable suspicion" that a person had committed or was committing a crime.[9] Thus reassured that our traffic stop evaluations on a "reasonable articulable suspicion" standard have a sound legal basis, we commend them to the court below.

2. In his last enumeration, Anderson claims that his consent to the search of the vehicle was invalid because it was a product of a "continued detention" after the purpose for the traffic stop had been concluded. This contention is meritless.

In this case, the traffic stop concluded when Deputy Clemones handed Anderson's driver's license back to him. The request to search came immediately upon such action, and the request, itself, did not extend the detention. Nor were any additional questions asked so as to make applicable those cases upon which Anderson relies wherein

---

[5] (Citation omitted.) *Florida v. Royer*, 460 U. S. 491, 498 (103 SC 1319, 75 LE2d 229) (1983).

[6] 422 U. S. 873 (95 SC 2574, 45 LE2d 607) (1975).

[7] 468 U. S. 420 (104 SC 3138, 82 LE2d 317) (1984).

[8] 470 U. S. 675 (105 SC 1568, 84 LE2d 605) (1985).

[9] See id. at 682.

further, unrelated interrogation occurred after the traffic stop had concluded.[10] We decline to accept Anderson's argument that a request for consent to search, in and of itself, constitutes a continued detention and questioning.[11]

Meritless also is Anderson's contention that he was "not free to go" because Clemones' vehicle was blocking his. Testimony at the suppression hearing shows that the deputy's single request for consent to search occurred before any attempt to leave could possibly have been made by either party, and Anderson consented to such search before the issue of departure was presented. Moreover, the evidence shows that Clemones did not deliberately block Anderson's car in order to prevent him from leaving, but initially pulled in behind Anderson because he "had to put [his] car somewhere." Accordingly, it is clear that the position of Clemones' vehicle did not "prevent" Anderson from leaving; his consent to a search forestalled such act.

> Having effected a valid traffic stop, the officer was authorized to request consent to search the automobile. The stop did not exceed the bounds of a brief investigative detention, so [Anderson's] consent to search was not the product of an illegal detention. The evidence supports the court's finding that his consent was freely and voluntarily given.[12]

*Judgment affirmed. Adams, J., concurs. Ruffin, P. J., concurs specially.*

RUFFIN, Presiding Judge, concurring specially.

Although I agree with the result reached by the majority, I write separately to clarify my position that Deputy Clemones' actions fall on the very cusp of permissible police conduct.

As noted by the majority, the evidence shows that Clemones had reason to believe that Anderson was driving after having had his license suspended. Thus, Clemones was authorized to stop Anderson to ascertain whether he had obtained a valid driver's license. After Clemones determined that Anderson did have a valid license, Clemones *then* asked for permission to search the car. In other words,

---

[10] See, e.g., *State v. Gibbons*, 248 Ga. App. 859 (547 SE2d 679) (2001); *State v. Jones*, 252 Ga. App. 404, 406 (1) (556 SE2d 495) (2001); *Migliore v. State of Ga.*, 240 Ga. App. 783, 784 (525 SE2d 166) (1999).

[11] See *Schneckloth v. Bustamonte*, 412 U. S. 218 (93 SC 2041, 36 LE2d 854) (1973). Accord *Navicky v. State*, 245 Ga. App. 284, 285 (2) (537 SE2d 740) (2000); *Gamble v. State*, 223 Ga. App. 653, 656 (3) (478 SE2d 455) (1996); *Kan v. State*, 199 Ga. App. 170, 171 (1), (2) (404 SE2d 281) (1991).

[12] (Punctuation and footnotes omitted.) *Navicky v. State*, supra at 285 (2).

the purpose for the traffic stop was at an end before Clemones sought permission to search the vehicle.

Under the Fourth Amendment, searches and seizures — including traffic stops — must be reasonable.[13] Moreover,

> if [an] officer continues to detain [a motorist] after the conclusion of the traffic stop and interrogates him or seeks consent to search without reasonable suspicion of criminal activity, the officer has exceeded the scope of a permissible investigation of the initial traffic stop. This is so because a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.[14]

Given that the traffic stop was at an end, I am troubled by Clemones' decision to ask for consent to search Anderson's car. However, in addressing this issue, this Court has focused on whether the officer's request results in any further detention of the motorist. Where, as here, an officer asks consent to search immediately following the conclusion of the traffic stop — with no delay — this Court has found such request does not violate Fourth Amendment principles.[15] This is so because it is the detention that makes an officer's continued questioning impermissible.[16] Accordingly, as the evidence shows that Clemones requested permission to search *immediately* after concluding the traffic stop and that he did not ask other questions unrelated to the stop in order to prolong the detention, his request here did not offend the Fourth Amendment.[17] It follows that the trial court did not err in denying Clemones' motion to suppress.

DECIDED JANUARY 12, 2004.

*Hine & Niedrach, Christopher P. Twyman*, for appellant.
*Leigh E. Patterson, District Attorney, John F. McClellan, Jr., Assistant District Attorney*, for appellee.

---

[13] See *State v. Williams*, 264 Ga. App. 199 (590 SE2d 151) (2003).
[14] (Punctuation and emphasis omitted.) *Padron v. State*, 254 Ga. App. 265, 268 (1) (562 SE2d 244) (2002).
[15] See *Evans v. State*, 262 Ga. App. 712, 715 (1) (a) (586 SE2d 400) (2003); *Navicky v. State*, 245 Ga. App. 284, 285 (2) (537 SE2d 740) (2000).
[16] See *Henderson v. State*, 250 Ga. App. 278, 280 (551 SE2d 400) (2001) (physical precedent only).
[17] See *Navicky*, supra.